IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 16, 2008 Session

## STATE OF TENNESSEE v. ERIC D. TURNER and ROBERT DEE SCRIBNER, II

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-C-2627     J. Randall Wyatt, Jr., Judge**

_____

**No. M2008-00253-CCA-R3-CD - Filed March 12, 2009**

_____

The defendants, Eric D. Turner and Robert Dee Scribner, II, were indicted by the Davidson County Grand Jury in a three-count indictment for rape of a child, a Class A felony, with Scribner charged with two counts and Turner charged with one count. Following their jury trial, Scribner was convicted of one of the two counts with which he was charged and sentenced as a child rapist to sixteen years at 100 percent in the Department of Correction. Turner was convicted of the lesser-included offense of attempted rape of a child, a Class B felony, and sentenced as a Range I, standard offender to ten years in the Department of Correction. Both defendants challenge the sufficiency of the convicting evidence on appeal. Turner additionally argues that the trial court erred by instructing the jury on the lesser-included offense of attempted rape of a child, and Scribner argues that the trial court erred by admitting DNA evidence without a proper chain of custody, by not granting a requested special jury instruction, and by enhancing his sentence beyond the minimum in the range. Having reviewed the record and found no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Cynthia M. Fort and Matthew Mayo, Nashville, Tennessee, for the appellant, Eric D. Turner.
David M. Hopkins, Nashville, Tennessee, for the appellant, Robert Dee Scribner, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and J.W. Hupp, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendants' January 24, 2006, sexual encounter with the twelve-year-old victim, A. D.[1]  According to the State's proof at trial, the victim became acquainted with twenty-three-year-old Turner and his twenty-two-year-old cousin, Scribner, through an adult chat line.  On January 24, 2006, by prearrangement with the victim, the men picked up the victim from the street near her home and took her to Turner's house.  Both men engaged in sexual activity with the victim at Turner's house and then took her back to her own home.  Confronted by her mother that evening, the victim initially admitted to penile-vaginal intercourse with Scribner.  A criminal investigation ensued, and she eventually admitted that she had engaged in sexual intercourse with both defendants during the January 24, 2006, episode at Turner's home.

At the defendants' August 27-28, 2007, joint trial, Metro Police Sex Crimes Detective Heather Baltz testified that she went to the victim's home on January 24, 2006, in response to a patrol officer's report of a child that might have been involved in a criminal sexual situation.  After speaking with the victim and her mother, she accompanied the victim to the hospital, where a physical examination was performed and evidence collected for a rape kit.  Detective Baltz stated that she took custody of the rape kit evidence and followed the standard practice of booking it into the Metro Police Property Room, where it was assigned a case number that was on all the paperwork connected with the evidence.  She then transported the evidence to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis, where the TBI assigned its own internal reference numbers to it.

Detective Baltz testified that the victim provided her with the nicknames, "Kelondo"and "Little Daddy," later identified as Turner and Scribner, respectively.  The victim initially mentioned only that she had engaged in penile-vaginal intercourse with Scribner but, during the course of her subsequent interviews, which occurred on February 10, February 14, and April 13, stated that she had sexual intercourse with both men.  Detective Baltz testified that she interviewed each defendant, using a casual, non-confrontational approach designed to get them to open up about the incident.  She laid out the victim's allegations to Turner, "present[ing] it as if they did have sex."  He did not deny it, and when she asked Turner if he had used a condom, he replied that he did not remember.  She took the same approach with Scribner, who ultimately acknowledged that he had oral sex with the victim but continued to deny that he had engaged in vaginal sex with her.  Detective Baltz stated that she collected cheek swabs from each defendant, which she submitted for DNA analysis.  The tape recording of both interviews was played aloud for the jury and admitted into evidence.

On cross-examination, Detective Baltz acknowledged that each man expressed surprise, with Scribner appearing "extremely surprised," when she revealed the victim's age.  She further acknowledged that the victim initially told her that she first met Turner at a convenience store, called Scribner to come pick her up, and had vaginal intercourse with Scribner.  She confirmed that the victim did not tell her that she had sexual intercourse with Turner until the February 10 interview and did not admit to having met him on a chat line, rather than in a store, until the April 13

---

[1]It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

interview. She said that the victim explained that she knew she should not have been on the adult chat line and was afraid that she would get in trouble for having used it.

Detective Baltz testified that she did not ask the victim on January 24 if she had sexual relations with Turner but began to suspect as the night wore on that she had intercourse with both defendants. She said she interpreted Turner's statements that he was not going to lie about it and that he "got with" the victim as an admission that he had engaged in some type of sexual activity with her. She stated that when she confronted Scribner with the victim's allegation that they had sex three times, he denied vaginal sex but "seemed very comfortable . . . admitting oral sex" until she explained to him that oral sex was a crime.

The victim testified that her date of birth was March 18, 1993, and that she was currently fourteen years old. She said that she became acquainted with Turner in December 2005 or January 2006 after calling a chat line advertised on television and that she told him she was sixteen years old. She talked to him more than once on the telephone and then arranged for him to pick her up down the street from her home. When he arrived, Scribner was in the vehicle with him. They took her to Turner's house, where all three of them went into Turner's bedroom and she sat on the bed. Turner asked her if she wanted to have sex, and she said yes. She lay down and Turner had sex with her, putting his "private part" inside her. She then had sex with Scribner as well, performing oral sex on him and engaging in vaginal intercourse. She had sex "more than one time" with both Scribner and Turner that day. Turner played a pornographic movie on the television during part of the time she was in his bedroom. Afterwards, both men took her home.

On cross-examination, the victim testified that she had been talking with Turner on the chat line for about two weeks before the incident occurred. She had never spoken to Scribner before meeting him that day. She denied that she told the men that she was eighteen and employed. She said that both Scribner and Turner remained in the bedroom during the entire episode.

Sue Ross, a pediatric nurse practitioner with Our Kids Center in Nashville, testified that she examined the victim at General Hospital on January 24, 2006. She said she found nothing of note in her genital examination of the victim but explained that was not unusual due to the elasticity of the tissue in a child who has already gone through puberty. She collected oral, vaginal, and cervical swabs as part of the rape kit, and her records reflected that she placed the evidence in the hospital's lock box for later collection by the detective investigating the case. Ross identified the evidence she had collected by, among other things, the packaging in which she had wrapped it and the hospital seal she had placed across the envelopes.

TBI Special Agent Forensic Scientist Charles Hardy identified the rape kit evidence and the defendants' cheek swabs by, among other things, the Metro Police Department case number, as well as the TBI case number that was assigned to the evidence upon its receipt into the TBI Laboratory. He stated that the evidence receiving section of the laboratory would not accept evidence that was not sealed. The unsealed rape kit evidence was boxed and shipped to Bode Technology, a laboratory in Virginia, for analysis, while he processed the cheek swabs internally at the TBI Laboratory in

Nashville. A single male profile was obtained from sperm recovered from the victim's vaginal and cervical swabs, which, upon comparison, was a "full profile match" to Scribner's DNA. According to Agent Hardy, the probability of an unrelated individual from the African-American, Caucasian, Southeastern, Hispanic, or Southwestern Hispanic population having the same DNA profile exceeded the current world population.

Shana Mills, a forensic scientist with Bode Technology, identified the evidence analyzed in her laboratory and testified that it was sealed when it arrived. She said that her testing revealed the presumptive presence of sperm on the vaginal and cervical swabs. She found no sperm on the oral swab.

Sarah Shields, a DNA analyst at Bode Technology, testified that she isolated the DNA profiles from the victim's oral, vaginal, and cervical swabs, finding the presence of the same male DNA on the cervical and vaginal swabs.

The defendants elected not to testify and rested their cases without presenting any proof.

## ANALYSIS

### I. Attempted Rape of Child as Lesser-Included Offense

Turner first contends that the trial court erred by instructing the jury on attempted rape of a child. He concedes that attempted rape of a child is a lesser-included offense of rape of a child under the Burns[2] test, but argues that the proof at trial did not support the instruction, as the evidence, depending on how the jury viewed it, showed either that he did not rape the victim or that he completed the act of rape. The State argues that Turner has waived consideration of this issue by his failure to object to the instruction at trial. The State further argues that an instruction on attempted rape of a child was justified by the evidence, which included the victim's testimony that Turner had sexual intercourse with her, combined with the fact that the victim's vaginal and cervical swabs contained sperm from only Scribner. We agree with the State.

Tennessee Code Annotated section 40-18-110(d) (2006) provides in pertinent part:

> Prior to instructing the jury on the law, the trial judge shall give the parties an opportunity to object to the proposed lesser included offense instructions. If the defendant fails to object to a lesser included offense instruction, the inclusion of that lesser included offense instruction may not be presented as a ground for relief either in a motion for new trial or on appeal.

There is nothing in the record to show that Turner objected to the trial court's proposed jury instructions. We, therefore, conclude that he has waived consideration of the issue by his failure to

---

[2] State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999).

object to the inclusion of the instruction at trial. See id.; see also State v. Christopher S. Love, No. M2005-01731-CCA-R3-CD, 2006 WL 2843437, at *3 (Tenn. Crim. App. Oct. 5, 2006).

Regardless of the waiver, Turner would not be entitled to relief on the basis of this issue. In determining whether an instruction on a lesser-included offense is warranted, a court must first consider whether any evidence exists that reasonable minds could accept in support of the lesser-included offense. See State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999). The court must then consider whether the evidence, viewed in the light most favorable to the existence of the lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense. Id. In so doing, the court must consider the evidence liberally, in a light most favorable to the existence of the lesser-included offense, without making any judgments on the credibility of the evidence. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469.

The jury heard testimony from the victim that Turner stated his desire for sexual relations and then had sex with her, which involved his penetrating her vagina with his penis. However, the jury also heard that Turner used the vague phrase "got with her" when talking about the sexual encounter and that his semen was not found in the victim. This evidence was such that a reasonable jury could have found the existence of the lesser-included offense of attempted rape of a child. Moreover, such evidence was legally sufficient to support Turner's conviction of the lesser-included offense. We, therefore, agree with the State that the evidence supported an instruction on attempted rape of a child as a lesser-included offense.

## II. Sufficiency of the Evidence

Both defendants challenge the sufficiency of the convicting evidence on appeal, with Turner arguing that the trial court erred by not granting his motion for judgment of acquittal and Scribner arguing that the evidence was insufficient to sustain his conviction. "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); see also State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Thus, the question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory

of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Turner's Conviction for Attempted Rape of a Child

Relying on the same argument he raised regarding whether the proof supported the lesser-included offense instruction, Turner contends that there was no evidence at trial to support his conviction for attempted rape of the victim. We respectfully disagree.

At the time of the offense, rape of a child was defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

As previously stated, while the victim testified that Turner penetrated her vagina, Turner said only that he "got with her," and his semen was not found in her body. Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that he intended to have sexual intercourse with her and took a substantial step toward the commission of that act but did not penetrate her vagina. We conclude, therefore, that the evidence was more than sufficient to sustain his conviction for attempted rape of a child.

## B. Scribner's Conviction for Rape of a Child

Scribner contends that the evidence is insufficient to sustain his conviction for rape of a child because there was no proof that he acted knowingly or recklessly with regard to the victim's age. In support, he cites, *inter alia*, his meeting of the victim through an adults only chat line, her misrepresentation of her age, her appearance at the time of the incident, and her adult behavior of

-6-

consenting to sexual intercourse with men she had just met. The State argues, *inter alia*, that Scribner's decision to have sexual intercourse with a stranger who was under the age of thirteen at the time, without making any attempt to verify her age, is the very definition of recklessness.

Rape of a child does not specify a mental state in its statutory definition. See Tenn. Code Ann. § 39-13-522 (2006). Where a statutory definition "does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state." Id. § 39-11-301(c); see also State v. Barney, 986 S.W.2d 545, 550 (Tenn. 1999) ("Rape of a child requires sexual penetration of the victim, and the mental state required may range from intentional to knowing or reckless.").

We agree with the State that the evidence, viewed in the light most favorable to the State, was sufficient to establish that Scribner acted recklessly, at the very least, with respect to the victim's age. Tennessee Code Annotated section 39-11-302, which defines culpable mental states, provides in pertinent part:

(c) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(b), (c) (2006). The evidence establishes that Scribner had sexual intercourse with a twelve-year-old child he had just met, and with whom he had never before spoken, without making any efforts to ascertain her true age. While the victim may, arguably, appear older than twelve in the photograph admitted into evidence, taken on the day of the incident, she appears far younger than sixteen, the age she gave when meeting the defendants. In addition to the photograph, the jury had the benefit of seeing the victim's demeanor and appearance at trial, where her testimony was hesitant and difficult to elicit. From this evidence, the jury could have found beyond a reasonable doubt that, at the time Scribner had sexual intercourse with her, he was aware of, and consciously disregarded, a substantial and unjustifiable risk that she was less than thirteen years old. We conclude, therefore, that the evidence was sufficient to sustain the jury's verdict finding him guilty of rape of a child.

### III. Chain of Custody

Scribner next contends that the trial court erred in admitting the DNA evidence without a proper chain of custody established. He argues that the trial court should have excluded the evidence because "Detective Baltz never identified the items she recovered from Our Kids [Center], . . . nor did she testify what she specifically did with that rape kit or where it was during the lapse of time between its collection and testing by Agent Hardy." He also points out that she did not identify the

oral swab she collected from him or offer any testimony as to its whereabouts before it was received by the TBI. The State argues that the trial court properly exercised its discretion to admit the evidence. We, again, agree with the State.

In order for tangible evidence to be introduced at trial, the State must either introduce a witness who is able to identify the evidence or establish an unbroken chain of custody. State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998); State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). "The purpose of the chain of custody requirement is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. In theory at least, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (5th ed. 2005) (footnotes omitted). The State is not, however, required to establish facts that exclude any possibility of tampering; reasonable, rather than absolute, assurance as to the identity and integrity of the evidence is all that is required. Scott, 33 S.W.3d at 760 (citations omitted). Whether or not the required chain of custody has been sufficiently established lies within the sound discretion of the trial court, and the trial court's determination will not be reversed on appeal absent a clear showing of abuse of discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987).

Scribner raised his objection to the admission of the evidence at the beginning of Agent Hardy's testimony on the second day of trial, arguing that a proper chain of custody had not been established because neither Sue Ross nor Detective Baltz had identified the evidence and Ross had been uncertain as to what she had done with it following its collection. In response, the trial court first reviewed the testimony that had been offered the previous day by Detective Baltz, who had since left town on vacation. The court then held a jury-out hearing where both Ross and Hardy each testified at length with respect to the evidence's collection, storage, handling, and analysis. Ross identified the rape kit evidence by, among other things, the packaging in which it was wrapped; the victim's name, birth date, age, date and time of admission to the hospital, and medical record number, with which the packaging was labeled; and the evidence envelope in which it had been

sealed. After consulting her records, she testified that she placed the evidence in the hospital's lock box for later pick up by the police detective.

Hardy identified both the rape kit evidence and the oral swabs collected from the defendants by the Metro case number, the TBI bar code label, the TBI case number, the exhibit number, and the TBI lab tape with his initials across the seal. He said that evidence is always submitted to the TBI laboratory in a sealed state and identified the original blue evidence tape on the evidence envelopes with Detective Baltz's initials across it. He further identified the initials of the TBI technician who received the evidence into the laboratory. He stated that there was no evidence that the blue tape had been broken and no indication that anyone had tampered with the envelopes.

At the conclusion of the jury-out hearing, the trial court ruled the evidence admissible based upon its review of Detective Baltz's testimony and the additional testimony offered by Ross and Hardy. Thereafter, Ross and Hardy repeated their jury-out testimony before the jury.

We conclude that the trial court acted within its discretion in admitting the evidence. Although Detective Baltz did not identify the evidence, she testified that she collected oral cheek swabs from the defendants and submitted them for comparison with the DNA obtained from the victim's rape kit. She also testified that she took custody of the rape kit evidence and followed the standard procedure of booking it into the Metro property room, where it was assigned a case number, before transporting it to the TBI laboratory for analysis. Ross and Hardy each identified the evidence and testified in detail as to their respective roles in the collection, receipt, handling, and testing of the evidence. The scientists at the out-of-state laboratory also identified the rape kit evidence and testified about their respective roles in its analysis. Each witness in the chain testified that the evidence was sealed upon its arrival and showed no signs of tampering. As such, the circumstances established with reasonable assurance the identity and integrity of the evidence.

## IV. Special Jury Instruction

Scribner next contends that the trial court erred by not issuing in its entirety the special jury instruction he requested. Specifically, he argues that his requested jury instruction "would have given the jury a correct statement of the law as it relates to a victim's age being a circumstance surrounding conduct and the requisite culpable mental states of knowing or reckless pertaining to the . . . victim's age." The State responds by arguing that the trial court fully instructed the jury as to the requisite mental states and the circumstances to be considered in determining it.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court's denial of a request for special jury instructions is error only

when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

Scribner submitted the following written request for a special jury instruction, requesting that the trial court add these two sentences to the jury instructions on the requisite mental states for the offense: "The victim's age is a circumstance surrounding the conduct. The defendant must have acted knowingly or recklessly with regard [to] the victim's age before you can find the defendant guilty of rape of a child." The trial court agreed to include the first sentence in its knowing and reckless *mens rea* instructions, based on this court's language in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034 (Tenn. Crim. App. Nov. 30, 2004), perm. to appeal denied (Tenn. Mar. 21, 2005). The court, however, declined to include the second sentence in its instructions.

We agree with the State that the trial court's instructions fully and fairly stated the applicable law. In Chester Wayne Walters, this court recognized that rape of a child, which can be committed intentionally, knowingly, or recklessly, contains all three possible conduct elements: the nature of the defendant's conduct; the circumstances surrounding the defendant's conduct; and the result of the defendant's conduct. Id. at *13-14. Specifically, we concluded that the element of unlawful sexual penetration "was both nature of the conduct and result of the conduct," while "[t]he victim's age is a circumstance surrounding the conduct." Id. at *13.

Scribner concedes that the trial court's definitions of culpable mental states were correct statements of the law, but asserts that they were "complex at best and difficult to distinguish in light of the specific issue of a victim's age and how a defendant acted regarding it." However, as the State points out, he cites neither case law nor statute in support of a jury instruction corresponding to the second sentence of his requested special jury instruction. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## V. Sentencing

As his final issue, Scribner contends that the trial court erred by enhancing his sentence beyond the minimum within the range. Specifically, he argues that the enhancement and mitigating factors in his case balanced each other out and that the trial court should have sentenced him to the minimum fifteen-year sentence. The State argues that the trial court acted within its discretion in setting the sentence, and we agree.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

To determine the specific sentence within the range, as well as the appropriate combination of sentencing alternatives, the trial court shall consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (d) the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing for similar offenses in Tennessee; and (7) any statement the defendant makes in the defendant's own behalf at sentencing. Tenn. Code Ann. § 40-35-210(b) (2006).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S .W.2d at 169. Thus, in this case the defendant has the burden of illustrating that the sentence imposed by the trial court is excessive.

The trial court found one enhancement factor, based on Scribner's previous history of criminal convictions and criminal behavior, and one mitigating factor, based on the fact that he had cooperated with the investigation. Although the court found that the mitigating factor "kind of balanced" the enhancement factor, it did not, as Scribner asserts, find that they cancelled each other out. Instead, the trial court obviously afforded the enhancement factor greater weight, as reflected in its setting the sentence one year above the minimum in the range:

> So what I'm saying is, I think there's an enhancement factor in your case having to do with the previous criminal behavior. I think you may have cooperated in the investigation. That kind of balances that up a little bit. The Court is of the opinion that rather than what the [S]tate is saying, the much increased sentence that you've already got a sentence of . . . one hundred percent, and the Court is going to find that . . . the sentence in your case is going to be a sentence of sixteen years. It's going to be one year above the minimum is what it amounts to.

We conclude that there is no error in the trial court's sentencing determinations. In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed," and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2) (2006). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). Scribner has not, therefore, met his burden of showing that the sixteen-year sentence imposed by the trial court was excessive.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE